## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| CORY SANFORD, | ) | |
| | ) | |
| Defendant. | ) | Case No. 16-cr-20082 |

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF HIS
MOTION FOR *FRANKS HEARING***

NOW COMES the Defendant, CORY SANFORD, by and through his attorney,
ELISABETH R. POLLOCK of the Federal Defender's Office for the Central District of
Illinois, and for his Memorandum of Law in Support of the Motion for *Franks Hearing*
states as follows:

I.     **Factual Background**

       A.     **Execution of the search warrant**

       On September 27, 2016, at approximately 3:50 a.m., Officer Ben Stringer of the
Danville Police Department appeared before Judge Mark Goodwin of the Vermilion
County Circuit Court and requested a no-knock search warrant for Cory Sanford's
residence located at 608 North Logan Street in Danville, Illinois. After listening to the
testimony of Officer Stringer and witness Jane Doe, Judge Goodwin approved the
search warrant. At approximately 5:00 a.m., Danville Police officers executed the
warrant. Mr. Sanford and his girlfriend, Mardi Cunningham, were removed from the

residence prior to the search. The search yielded 26.1 grams of heroin, a handgun. ammunition, digital scales, and $1,745.00 in cash.

The testimony taken in support of the search warrant application is as follows[1]: first, Officer Stringer testified that at some unknown time prior to requesting the search warrant, he saw a vehicle depart the driveway at 608 N. Logan in Danville. He eventually, at an unknown time, pulled the vehicle over and searched it, discovering several syringes and a small amount of crystal methamphetamine. The driver of the vehicle was Jane Doe. When Jane Doe was interviewed (at an unknown location an unknown time) she stated that she obtained the drugs at 608 N. Logan Street.

Jane Doe also testified and claimed that she had been at the residence every day for the past week. She stated that she had been at the residence at 6:00 p.m. on September 26, 2016, at which time she traded a pint of Crown Royal and a pack of Newport cigarettes for a small sack of heroin. Ms. Doe then testified that she returned to the residence around 11:00 p.m. and traded beer, a doorbell, and alarm kit for more heroin, which she used immediately. With respect to the methamphetamine found in her vehicle, she claimed she bought it from a third party the previous evening while at Mr. Sanford's home. Jane Doe indicated that Mr. Sanford and his girlfriend lived at the residence, and that he had a firearm in his possession because he was robbed two weeks

---

[1] No written affidavit was filed in support of the request for search warrant. All testimony heard in support of the search warrant application was verbally conducted in the presence of a court reporter and memorialized in a 13-page transcript, which is attached hereto as Exhibit A.

before. She claimed to have personally seen the firearm. She also claimed that Mr.

Sanford had a felony conviction.

**B.      Facts omitted and/or misrepresented by Officer Stringer and Jane Doe**

Jane Doe's true identity is Ashley Hinkle, a/k/a Ashley Markham. (See Exhibit B

– Sworn Declaration of Ashley Hinkle) Ms. Hinkle states that she knows Mr. Sanford

from when she lived in Danville. On the evening of September 26, 2016, Ms. Hinkle was

at Cory Sanford's residence located at 608 North Logan in Danville, Illinois. When she

left his house, she noticed a Danville police car following her. Eventually, Officer

Stringer of the Danville Police Department pulled her over and ended up searching her

vehicle. During the search, he and other officers located some syringes and a small

amount of methamphetamine. At the time that that Ms. Hinkle was pulled over, she

had an outstanding warrant for failing to appear in court in Vermilion County Case

Number 15-CM-397. (See Exhibit B and Exhibit C – Docket Sheet from 15-CM-397)

Ms. Hinkle was transported to the Public Safety Building where she was

interviewed by Officer Stringer as well as other law enforcement officers, including Pat

Ablinger and Cory Benschneider. She states that she was told that if she did not

cooperate, she risked losing custody of her one-year old daughter. After she made her

statement, Officer Stringer took her to the courthouse to meet with a prosecutor. ASA

Pfohl and Officer Stringer told her that she had to repeat her earlier statement to a

judge. She was instructed to say that she had not been promised anything for testifying.

Ms. Hinkle initially believed that she would be charged with possession of drugs and

arrested on the outstanding warrant in 15-CM-397. However, when she asked Officer

Stringer about that, he stated that she would not be charged with any new offenses, and that the warrant would be taken care of. After Ms. Hinkle finished testifying, Officer Stringer took her back to her car and allowed her to drive it home even though she did not have a valid license. He also returned the syringes (with some heroin) to her at that time, although the methamphetamine was confiscated. (Exhibit B)

Three weeks later, on or about October 11, 2016, she was arrested on the outstanding warrant. (Exhibit C) She states that she was very confused and surprised because she believed that it had been taken care of after she testified about Cory Sanford to the judge. (Exhibit B)

A background check on Ms. Hinkle reveals an extensive criminal history in both Illinois and Indiana. Her criminal convictions include the following: driving on a suspended license (twice in Indiana in 2008), possession of a controlled substance (once in Illinois in 2009 and once in Indiana in 2009), forgery (2009), theft (2009), and resisting arrest (2012). She also has multiple additional criminal charges which resulted in *nolle pros* decisions by the Vermilion County State's Attorney, including theft (2009 and 2015) and forgery (2010).

During the testimony at the search warrant application, neither Officer Stringer nor Ms. Hinkle mentioned her criminal history or the fact that she had an active warrant at that time. Judge Goodwin independently asked if she had been threatened or treated unfairly, to which she responded no. He also inquired whether any deals had been made in exchange for her providing testimony, to which she responded no. (Exhibit A)

It is clear from Ms. Hinkle's Sworn Declaration and from her background check that at the time of her testimony in this case, she had a lengthy criminal record as well as an active warrant. This information was withheld from Judge Goodwin by both Officer Stringer and Ms. Hinkle. She was not arrested on that warrant until almost three weeks later and was never charged with the possession of methamphetamine or drug paraphernalia that she admitted to having on her person that evening. Even more surprising, she states that Officer Stringer returned drug syringes and heroin to her possession and assured her that no criminal charges would result. He also assured her that her pending warrant would be "taken care of." (Exhibit B) None of these agreements were disclosed to Judge Goodwin before he decided to issue the warrant. (Exhibit A)

## II.      Standard of Law

To obtain a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), the defendant must make a substantial preliminary showing of (1) a material falsity or omission that would alter the probable cause determination, and (2) a deliberate or reckless disregard for the truth. *United States v. Glover*, 755 F.3d 811, 819-820 (7th Cir. 2014). In order to obtain a *Franks* hearing, the defendant need not overcome the court's speculation regarding an innocent explanation for the falsity or omission. While reasonable explanations for the omission of the information might well exist, the defendant need not disprove them before the *Franks* hearing itself. *Id.* at 820.

### III.  Argument

#### A.  There was substantial relevant information withheld from the issuing judge which would have altered the probable cause determination in this case.

The issuance of the search warrant in this case rests solely on the credibility of Ms. Hinkle's testimony. There was no independent evidence linking Mr. Sanford's residence to any form of illegal activity *except* for the statements made by her. When the justification for a search warrant is based on an informant's report, the question for the Court to consider is that of the totality of the circumstances related to that report. *Glover,* 755 F.3d at 816 (citing *Illinois v. Gates,* 462 U.S. 213, 238 (1983)). Reliability, veracity, and the basis of knowledge of the informant are all "highly relevant," but the totality-of-the-circumstances approach means "a deficiency in one may be compensated for ... by some other indicia of reliability." *Id.* District courts look to five primary factors in evaluating the totality of the circumstances: "the level of detail, the extent of firsthand observation, the degree of corroboration, the time between the events reported and the warrant application, and whether the informant appeared or testified before the magistrate." *Id.*

In the present case, there was absolutely no corroboration of Jane Doe's claims. Corroboration by an officer's independent investigation serves to support a finding of reliability. *United States v. Lloyd,* 71 F.3d 1256, 1263 (7th Cir. 1995). In *Lloyd,* the informant was deemed credible in part because the police drove by the defendant's house with the informant, confirmed the description of the residence, had the informant identify the defendant in a photo lineup, and conducted a criminal background check of the

defendant. *Id.* at 1259. In contrast to *Lloyd,* where there is *no* independent police corroboration, even an informant's appearance before the judge may not be enough to justify issuing a search warrant. *United States v. Peck,* 317 F.3d 754, 756-57 (7th Cir. 2003).

Officer Stringer never ran a background check on Mr. Sanford to verify his criminal history, nor did he conduct a search for property records to link Mr. Sanford or his girlfriend to the address to be searched. He also did not take Ms. Hinkle by the house to confirm the location, nor did not have her identify Mr. Sanford from a lineup. There were no other interviews conducted, no controlled buys conducted, and no additional verification of Ms. Hinkle's information.

Additionally, there are extremely serious challenges to Ms. Hinkle's credibility that were wholly omitted from the testimony in support of the warrant. First, it was not disclosed that she had several criminal convictions in two different jurisdictions under two different names. Second, it was not disclosed that she had a *pending* arrest warrant resulting from a theft case, a crime of dishonesty. Further, Ms. Hinkle was instructed to state that she had received no promises or assurances regarding possible criminal conduct from that evening, when in fact Officer Stringer and his colleagues *did* promise her that she would not be charged and would not be arrested on her pending warrant. These omissions and misrepresentations were clearly at least reckless, if not intentional.

As the Seventh Circuit held in *Glover,* "the complete omission of information regarding Doe's credibility is insurmountable" and "undermines the deference" that would normally be given to the magistrate's decision to issue the warrant. *Id.* at 816. Information about the informant's credibility or potential bias is crucial. *Id.* In the

present case, not only did Ms. Hinkle's entire criminal record and active arrest warrant fail to make it in front of the issuing judge, Officer Stringer also utterly failed to discuss other factors regarding her reliability, such as a) any past experience acting as a confidential source or b) her prior uses of aliases. He did not even bother to claim that she was reliable; perhaps he thought it unnecessary because she appeared in person before Judge Goodwin. That appearance, however, does not remedy the problem that multitudinous damaging and highly relevant facts were withheld from the issuing judge.

**B.** **The omissions and misrepresentations noted above require a *Franks* Hearing**

"To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons." *Franks*, 438 U.S. at 172. In this case, the defense alleges that Officer Stringer either recklessly failed to do his job, or alternatively, intentionally misled Judge Goodwin by failing to disclose Ms. Hinkle's lengthy criminal history and pending arrest warrant. He also instructed her to state that she was receiving no benefits from testifying, when that is demonstrably false. The Seventh Circuit has recognized that omitting credibility information is clearly material to the probable cause determination. *Glover,* 755 F.3d at 820. In this case, Judge

Goodwin never heard about Ms. Hinkle's criminal record, that she had an active arrest warrant at the time, or that she was assured that she would not be charged or arrested if she testified; this is supported by the transcript of the hearing, the facts as stated above, and the Exhibits attached hereto.

"Only the inquiry into the officer's state of mind remains. To meet his burden on that element, the defendant must offer direct evidence of the affiant's state of mind or circumstantial evidence that the affiant had a subjective intent to deceive based on the nature of the omissions." *Id.* As a matter of common sense, obtaining direct evidence of the officer's state of mind is virtually impossible. However, credibility omissions do provide sufficient circumstantial evidence to support a reasonable inference of reckless disregard for the truth. *Id.* The issues of a) whether Officer Stringer recklessly disregarded his knowledge of Ms. Hinkle's credibility or intentionally omitted it, and b) whether the good faith exception outlined in *United States v. Leon*, 468 U.S. 897 (1984), should apply should only be determined after the *Franks* Hearing. *Glover,* 755 F.3d at 820.

WHEREFORE, based on the foregoing, Defendant Cory Sanford respectfully requests that the district court order a *Franks* Hearing to determine the validity of the search warrant, and if the Court determines that the warrant was unlawfully issued, for the suppression of all evidence discovered pursuant to the execution of the search warrant.

Respectfully submitted,
CORY SANFORD, Defendant

/s/ Elisabeth R. Pollock
Assistant Federal Public Defender
300 West Main Street
Urbana, IL 61801
(217) 373-0666
(217 373-0666 FAX
Elisabeth_Pollock@fd.org

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 7, 2017, I electronically filed the foregoing with the

Clerk of Court using the CM/ECF system which will send notification of such filing to

Assistant United States Attorney Bryan Freres.

/s/ Elisabeth R. Pollock
Assistant Federal Public Defender
300 West Main Street
Urbana, IL 61801
(217) 373-0666
(217 373-0666 FAX
Elisabeth_Pollock@fd.org

4

5   RE:                              )

6       THE VERMILION COUNTY STATE'S  )

7   ATTORNEY'S OFFICE REQUEST FOR     )    Case No.   16-MR-337

8   SEARCH WARRANT.                   )

9                              Defendant)

10

11             TRANSCRIPT OF PROCEEDINGS

12      BE IT REMEMBERED, and CERTIFIED, that on the 27th day of

13   September, 2016, the following proceedings were held in the

14   aforesaid cause before the Honorable Mark S. Goodwin, Associate

15   Circuit Judge.

16

17   APPEARANCES:

18                         MS. ELIZABETH PFOHL

19                         Assistant State's Attorney

20

21        **    608 North Logan, Danville, IL   **

22        (Officer Ben Stringer and Jane Doe)

23

24   Electronically Recorded Proceedings transcribed by:

*Connie S. Maring*
*Court Specialist Supervisor*

EXHIBIT A

```
1   (Tuesday, September 27, 2016 at 3:40 a.m.)  PROOF ONLY

2              WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN

3   COURT:

4              THE COURT:  It is Tuesday, September 27, 2016, 3:40

5   a.m., uh, here with Officer Ben Stringer, uh, along with a witness,

6   uh, who the Court will identify as Jane Doe.  Miss Pfohl is present

7   -- this, uh, Application for a Search Warrant, uh, it pertains to

8   a property at 608 North Logan, Danville, uh, Illinois.

9       Uh, Officer Stringer, we'll start with you, sir.  If you can

10  raise your right hand?  Do you solemnly swear the testimony you're

11  about to give in this matter is the truth, the whole truth, and

12  nothing but the truth?

13             OFFICER STRINGER:  I do.

14             THE COURT:  All right.

15      Miss Pfohl.

16                     (Witness sworn.)

17         B E N J A M I N     S T R I N G E R,

18  called as a witness on behalf of the People, being first duly sworn,

19  was examined and testified as follows:

20                  DIRECT EXAMINATION

21                  BY MS. PFOHL:

22      Q.  Can you state your name and occupation for the

23  record?

24      A.  Benjamin Stringer.  I'm a police officer for the
```

1  City of Danville, currently assigned to Third Shift Patrol.

2        A.  And, um, today while you were on duty did you -- were

3  you observing 608 North Logan?

4        A.  I was in the area and I observed a car leave the

5  driveway of 608 North Logan.

6        Q.  And did you eventually pull that car over?

7        A.  I did.

8        Q.  And who was dri-, and was that Jane Doe driving that

9  car?

10        A.  Yes, it was.

11        Q.  Um, what'd you eventually locate in the car?

12        A.  Uh, during a search of the car, uh, we located

13  several syringes and a small amount of crystal methamphetamine.

14     After speaking with Jane Doe, she pro-, uh, provided

15  information al-, about the residence she had just left, which was

16  later identified as 608 North Logan.

17        Q.  And that's where she got drugs?

18        A.  Yes.

19        Q.  And can you describe 608 North Logan?

20        A.  Yes.  It is a two-story single/family dwelling.

21  The letters "608" in black lettering on the front of the house,

22  which is the East side.

23     Jane Doe also advised there was a refrigerator in -- on the

24  front porch, which, uh, we took Jane Doe by the address and she

1   identified the address and there was a refrigerator on the front

2   door -- er-, front porch.

3       Q.  Okay.  I have nothing further for Officer Stringer

4   at this time.

5           THE COURT:  All right.

6       All right, ma'am.  Can you raise your right hand, please?

7   Do you solemnly swear the testimony you're about to give in this

8   matter is the truth, the whole truth, and nothing but the truth?

9           JANE DOE:  I do.

10                  (Witness sworn.)

11          THE COURT:  All right.  You're, uh, uh, name for

12  purposes of this testimony is Jane Doe.  Is that correct?

13          JANE DOE:  Yes.

14          THE COURT:  And, uh, without giving me the, uh, exact

15  location what community do you reside in?

16          JANE DOE:  Um, Crawfordsville, Indiana.

17          THE COURT:  All right.  Uh, this is Elizabeth Pfohl from

18  the State's Attorney's Office.  She's gonna make further inquiry

19  to you.

20                  J A N E      D O E,

21  called as a witness on behalf of the People, being first duly sworn,

22  was examined and testified as follows:

23                  DIRECT EXAMINATION

24                  BY MS. PFOHL:

1          Q.   Um, are you familiar with the residence of 608 North
2    Logan?

3          A.   Yes, ma'am.

4          Q.   Um, have you been there before?

5          A.   Yes, ma'am.

6          Q.   All right.  How often have you been over there?

7          A.   Um, at least every day for the past week.

8          Q.   And were you over there at 6:00 p.m. on the 26th?

9          A.   Yes.

10         Q.   What's you do when you was at -- while you were there?

11         A.   I had traded some stuff that I'd bought for the --
12    from the store for some (H) -- Heroin.

13         Q.   Okay.  What stuff did you trade.

14         A.   Uh, a pint of Crown Royal and a pack of Newport
15    cigarettes for a 20 sack.

16         Q.   Okay.  And did you eventually leave the residence?

17         A.   Yes.

18         Q.   And did you go back there that night around 11:00?

19         A.   Yes.

20         Q.   Okay.  And what'd you do while you were there at that
21    time?

22         A.   I had then traded in three (3) twelve packs of Miller
23    Lite, a door bell, and some alarm kits.

24         Q.   And you traded that for Heroin again?

1    A.   Yes, for Heroin.

2    Q.   And did you -- what did you do with the Heroin?

3    A.   I use -- I used it.  I injected it.

4    Q.   And I thought you said there was some crystal

5 methamphetamine in your car.  Where'd you get that from?

6    A.   I got that from Cory's the night before --

7    Q.   And you --

8    A.   -- from a guy that was there.

9    Q.   Cory's?  Who is that?

10   A.   Cory Sanford.

11   Q.   All right.  And to the best of your knowledge does

12 he live at 608 North Logan?

13   A.   Yes, ma'am.

14   Q.   Does he live there alone?

15   A.   No.  Um, he lives there with his girlfriend, Mardi

16 Cunningham.

17   Q.   Okay.  And when you go over there and you got the

18 drugs -- have you always gotten them from Cory there?

19   A.   Yes.  Uh, one time -- one time I got them from his

20 girlfriend, and then -- uh, there'd be other people in the house

21 -- I -- we'd get them to (Inaudible.) the ice.

22   Q.   I'm sorry.

23   A.   (Inaudible) cousin -- but it was at Cory's house.

24   Q.   So then -- you know that residence to be Cory's

1   house?

2           A.   Uh-huh.   (Affirmative)

3           Q.   And you know the drugs to be his?

4           A.   Yes.

5           Q.   All right.   Um, while you were over there at 11:00

6   p.m. on the 26th, uh, did he have any sort of weapon on him?

7           A.   He had a gun.

8           Q.   Um, what was he doing with the gun?

9           A.   He was, um, playing with it.   Pointing it at his door

10  and I had asked him to please put the gun away -- I'm afraid of

11  guns.

12          Q.   Did he put it away?

13          A.   Not right away, but his cousin had influenced him

14  to.

15          Q.   Okay.   And then did he get it out again?

16          A.   Yes.

17          Q.   What did he do while he had it out?

18          A.   Um, his girlfriend was knocking on the door cause

19  the front door was locked.   The screen door was locked and, uh,

20  he pointed the gun at the door and said, "Bam, that's what's gonna

21  happen to someone next time they try to rob my house."

22          Q.   Okay.

23          A.   Cause he carries the gun because he was robbed.

24          Q.   And he was robbed a couple weeks ago?

1    A.  Uh-huh.  (Affirmative)  Yes.

2    Q.  Okay.  So when you went to get the -- when you went

3  to trade for the Heroin where -- where was he keeping it?

4    A.  It was upstairs.

5    Q.  Do you know where upstairs?

6    A.  I don't know exactly where, no.

7    Q.  Okay.  And after he had given ya some of -- did he

8  give you all of the Heroin or just some of it?

9    A.  He gave me some of it.

10    Q.  What did he do with the rest of it?

11    A.  Um, it was sitting on the table in the baggie for

12  the longest time, and then, um, eventually he had picked it up and

13  put it back in his pocket.

14    Q.  Okay.

15    A.  Um, I would like to state that there's a -- there

16  should be a (Inaudible.) cleaning it up, but there is a, a big circle

17  of powder residue on his table from where he had set a (Inaudible.)

18  of Heroin down and picked it back up.

19    Q.  Okay.  And you were -- you eventually left the

20  residence?

21    A.  Yes.

22    Q.  And you were stopped by Officer Stringer?

23    A.  Yes.

24    Q.  And you talked to him about having gotten some of

1  the drugs.

2          A.  Yes.

3          Q.  And you agreed to come to court and testify?

4          A.  Yes.

5          Q.  All right.  To the best of your knowledge has Mr.

6  Sanford ever been convicted of a Felony?

7          A.  Yes.

8          MS. PFOHL:  Nothing further.

9          OFFICER STRINGER:  Judge, I, uh, I have a couple things,

10  we are asking --

11          THE COURT:  Let, let me make further inquiry.  Keep your

12  thought, please.

13          OFFICER STRINGER:  Oh, I'm sorry.

14          THE COURT:  Ma'am, uh, you, you've testified that you

15  are doing this voluntarily.

16          A.  Yes.

17          THE COURT:  Um, has Officer Stringer or any other member

18  of any law enforcement agency, um, made any threats to you in any

19  way that if you didn't come in here and testify that tha-, um, you

20  were gonna be punished or, or in any way treated unfairly?

21          A.  No, sir.

22          THE COURT:  Uh, now at the time of your stop, um, and,

23  and when you were detained you had, uh, illegal controlled

24  substances in your possession.  Correct?

```
 1            A.  Yes.

 2            THE COURT:  All right.  And, uh, have they made any

 3    promises to you of any kind, uh, relative to that offense in

 4    exchange for you providing this testimony?

 5            A.  No.

 6            THE COURT:  All right.  And you understand that you are

 7    subject to prosecution for whatever offenses you may of committed,

 8    uh, last evening?

 9            A.  Yes.

10            THE COURT:  And everything you've testified to this

11    evening or this morning is true and correct?

12            A.  Yes.

13            THE COURT:  All right.

14        All right, Officer Stringer.

15            OFFICER STRINGER:  Judge, we are, uh, it's not in the

16    search warrant, but we are asking for a "no-knock search warrant"

17    due to the fact that Cory Sanford did have a gun er-, a firearm

18    in his possession, and Jane Doe did advise that she had purchased

19    for traded an alarm system, uh, because she had knowledge that he

20    had gotten robbed in the last two (2) weeks.  So we are asking for

21    a no-knock search warrant, um, it is not listed in the warrant,

22    but we wish to add that on there.

23            THE COURT:  All right.  Anything else, Miss Pfhol?

24            MS. PFOHL:  No, Your Honor.
```

1          THE COURT:  All right.  Officer, uh, I'm gonna place

2 before you the, uh, Complaint for Search Warrant.  Uh, if

3 everything's true and correct -- if you would please execute that

4 document.

5     All right.  And the officer has executed the Complaint for

6 Search Warrant before the Court.

7     At this time based on the content of that document as well

8 as the sworn testimony from Officer Stringer and the witness

9 identified for purposes of these, uh, proceedings as "Jane Doe",

10 the Court will find there is probable cause for the, uh, search

11 of 608 North Logan, Danville, uh, Vermilion County, Illinois.

12 That house being described in the Complaint and the testimony, uh,

13 as being a white two-story single/family dwelling with white

14 siding.   The numbers "608" on the East side, uh, of that structure.

15     Uh, that property will be, uh, searched for any US currency,

16 evidence of occupancy, residency, or ownership, any, uh,

17 controlled substances, uh, scheduled by, uh, Illinois statute, uh,

18 that including any, uh, powder like substances, any drug

19 paraphernalia, guns, ammunition, or other items which constitute

20 the evidence of a possession of -- of the offense of Possession

21 of a Controlled Substance and Possession of Controlled Substance

22 with Intent to Deliver, uh, as well as, uh, the charge of Possession

23 of a Weapon by a Felon.

24     This, uh, warrant, uh, is issued, uh, enabling law enforcement

1   to execute the same on a "no-knock" basis.  The Court, uh, denoting

2   that same on the face of the Search Warrant -- by the words

3   "no-knock" warrant.

4        The Court having, uh, cause, uh, for concern and, uh, probable

5   cause that there is possessions of, uh, weapons on the premises

6   that justifies that execution.

7        It is 3:50 a.m. at the time of the issuance of this warrant.

8   All right, anything else on that matter?

9          MS. PFOHL:  No, Your Honor.

10               End of proceedings.

11

12

13

14

15

16

17

18

19

20

21

22

23

CERTIFICATE

I, Connie S. Maring, Court Specialist Supervisor in and for the County of Vermilion, State of Illinois, do hereby certify the foregoing to be a true and accurate transcript of the electronic recording of the proceeding of the above entitled cause which recording contained a certification in accordance with rule or administrative order on said day.

Dated this __2nd__ day of __ December__ , 2016.

Connie S. Maring
Court Specialist Supervisor

13

# SWORN DECLARATION

Under oath, I depose and state as follows:

1.      My name is Ashley Hinkle and I am currently in custody in the Montgomery County Jail located in Crawfordsville, Indiana. I am also sometimes known as Ashley Markham. My birthdate is ███████████

2.      I am familiar with an individual named Cory Sanford as well as his girlfriend, Mardi Cunningham. We were friends and I know them from when I stayed in Danville, Illinois.

3.      On the evening of September 26, 2016, I was at Cory Sanford's residence located at 608 North Logan in Danville, Illinois. When I left his house, I noticed a Danville police car following me.

4.      Eventually, Officer Stringer of the Danville Police Department pulled me over in the vehicle I was driving. He and other officers searched the vehicle and located ~~a small bag of heroin,~~ some syringes, and a small amount of methamphetamine. At the time that I was pulled over, I knew that I had an outstanding warrant for failing to appear in court in a misdemeanor case.

5.      I was taken to the Public Safety Building where I was interviewed by Officer Stringer as well as other officers including Pat Ablinger and Cory Benschneider. I was told that if I did not cooperate, they would take my one-year old daughter away from me.

6.      After I made my statement, Officer Stringer took me to the courthouse to meet with a prosecutor. She and Officer Stringer told me I had to repeat my statement to a judge and they told me to say that I had not been promised anything for testifying. At first, I believed I would be charged with possession of drugs and arrested on my outstanding warrant. However, when I asked Officer Stringer about that he told me that I would not be charged with any new offenses, and that the warrant would be taken care of.

7.      When I was finished testifying, Officer Stringer took me back to my car and allowed me to drive it home even though I did not have a valid license. He also returned my heroin and syringes to me at that time. I then went home.

8.      About three weeks or so later, I was arrested on the outstanding warrant. I was very confused and surprised because I believed that it had been taken care of after I testified about Cory Sanford to the judge.

EXHIBIT B

I declare and certify under penalty of perjury that the information set forth in this affidavit is true and correct.

Signed and executed this ___7th___ day of June, 2017.



ASHLEY HINKLE

Witness

06/07/17

# Vermilion County, IL

**NOTICE:** By clicking the 'Search' button below, or otherwise using the Judici.com website,

**2015CM397  HINKLE, ASHLEY N**          Last Search | Information | Dispositions | History | Payments | Fines & Fees

| Date | Entry | Judge |
|------|-------|-------|
| | Entered Under: HINKLE, ASHLEY N | |
| 02/07/2017 | Check placed in the mail todays date.(bp) | UNASSIGNED |
| 02/03/2017 | Bond of $300.00 applied on 02/06/2017 with $270.00 refunded. | UNASSIGNED |
| 02/03/2017 | This plea nolle pros pursuant to plea. See docket entry on 17CM12. | DJG |
| 02/01/2017 | Notice returned undeliverable and on file. (acm) | UNASSIGNED |
| 01/31/2017 | Motion/reduce bail set for 02/03/2017 at 2:30 in courtroom 1B. | UNASSIGNED |
| 01/31/2017 | Motion for Reduction of Bail on file. Notice of hearing on file. | UNASSIGNED |
| 01/30/2017 | Warrant returned and filed -- served 01/24/2017 (acm) | UNASSIGNED |
| 01/25/2017 | Defendant present in custody via video after service of warrant. State present by Assistant State Attorney Van Fleet. Sworn testimony heard. Case reset for pretrial hearing and defendant given in court notice. Copy on file. Defendant remanded to the custody of the sheriff in lieu of $10,000 (10%). Bond to cover cases 17CM12 & 15CM397. Defendant advised of in absentia rights. Previous appointment of the Public Defender to stand. Defendant ordered to report to the PD office upon release. Pre-trial set for 03/14/2017 at 8:30 in courtroom 1B. Notice of appearance sent to HINKLE, ASHLEY N. (acm) | DJG |
| 01/24/2017 | Warrant issued on 01/24/2017 in the amount of $10,000 (10%) todays date, warrant to cover 17CM12 and 15CM397, copy on file. A FTA OF $75 SHALL BE ASSESSED PURSUANT TO 725 ILCS 5/110-7(I) | UNASSIGNED |
| 01/17/2017 | Bond forfeiture set for 02/21/2017 at 8:30 in courtroom 1A. | UNASSIGNED |
| 01/17/2017 | Case called for pretrial. State present by Assistant States Attorney Pfohl. Defendant fails to appear. State's motion for warrant is allowed. Warrant to issue. Bond set at $10,000.00 (10%). Warrant to cover both 2015cm397 and 2017cm12. Bond forfeiture to issue. Bond forteiture issued, copy on file. (DJC) | DJG |
| 11/29/2016 | Pre-trial set for 01/17/2017 at 8:30 in courtroom 1B. | UNASSIGNED |
| 11/29/2016 | Case called for pretrial. State present by Assistant State's Attorney Thomas Wiseman. Defendant in custody in fountain county. Assistant Public Defender Salazar present. Defendant moves to continue. State has no objection. Motion allowed. Case is reset, attorney Salazar given in court notice. Copy on file. (vmw) | DJG |
| 10/21/2016 | Bond of $300.00 (10%) posted on 10/21/2016 with assignment to Tina Romine, 911 Spann Avenue, Crawfordsville, IN 47933. FTA FEE OF $75.00 PAID. | UNASSIGNED |
| 10/14/2016 | Warrant returned and filed -- served 10/11/2016 (acm) | UNASSIGNED |
| 10/12/2016 | Pre-trial set for 11/29/2016 at 8:30 in courtroom 1B. Notice of appearance sent to HINKLE, ASHLEY N. | UNASSIGNED |
| 10/12/2016 | Defendant present in custody via video after service of warrant. State present by Assistant State's Attorney Thomas/Pfohl. Sworn testimony heard. Case reset for hearing and defendant given in court notice. Copy on file. Defendant remanded to the custody of the sheriff in lieu of $3,000 10% Deft. advised of in absentia rights. Previous appointment of the Public Defender to stand. Deft ordered to report to the PD office upon release.(gs) | DJG |
| 10/11/2016 | FTA Warrant served on 10/11/2016. | UNASSIGNED |
| 08/08/2016 | Warrant issued on 08/04/2016 in the amount of $3,000 (10%) todays date, copy on file. A FTA OF $75 SHALL BE ASSESSED PURSUANT TO 725 ILCS 5/110-7(I) | UNASSIGNED |
| 07/28/2016 | Case called for pretrial. State present by ASA Tom Wiseman. Defendant fails to appear. Public Defender Salazar present. Court orders warrant to issue in the amount of $3,000 (10%). (jnc) | DJG |
| 05/27/2016 | Quash Order returned and on file. (acb) | UNASSIGNED |
| 05/25/2016 | QUASH ORDER ISSUED & ON FILE - ORIGINAL SENT & FAXED TO PSB THIS DATE. Quash order receipt filed. | UNASSIGNED |
| 05/25/2016 | Case called for motion to quash. State present by Beth Pfohl. Defendant fails to appear. Public Defender Salazar present. Defendant's motion to quash warrant is allowed over State's objection. Case is reset for pre-trial, Public Defender given in court notice. Copy on file. Pre-trial set for 07/28/2016 at 8:30 in courtroom 1B. | KEW |
| 05/18/2016 | Motion To Quash on file. Notice Of Hearing on file. Motion/quash reset to 05/25/2016 at 10:30 in courtroom 1B. (acb) | UNASSIGNED |
| 05/16/2016 | Warrant issued on 05/16/2016 in the amount of $1,000 (10%) todays date, copy on file. A FTA OF $75 SHALL BE ASSESSED PURSUANT TO 725 ILCS 5/110-7(I) | UNASSIGNED |
| 05/03/2016 | Case called for pretrial. State present by ASA Beth Pfohl. Defendant fails to appear. Public Defender Salazar present. Court orders warrant to issue in the amount of $1,000 (10%). | KEW |
| 03/02/2016 | Notice undeliverable and on file. (acb) | UNASSIGNED |
| 02/26/2016 | Pre-trial set for 05/03/2016 at 8:30 in courtroom 1B. Notice of appearance sent to HINKLE, ASHLEY N. Notice of appearance sent to PD. Notice of appearance given to STATE'S ATTORNEY. | UNASSIGNED |
| 02/25/2016 | Due to the Courthouse being closed for inclement weather this case is rescheduled. Notice mailed to the deft. Copy on file. Copy of notice forwarded to State's Attorney's office and Public Defender's office. | UNASSIGNED |
| 12/21/2015 | Pre-trial set for 02/24/2016 at 8:30 in courtroom 1B. | UNASSIGNED |
| 12/21/2015 | Case called for pretrial. State present by ASA Tom Wiseman. Defendant present with PD Salazar. Defendant moves to continue. State has no objection. Motion allowed. Case is reset, defendant given in court notice. Copy on file. | KEW |
| 10/01/2015 | Pre-trial set for 12/21/2015 at 8:30 in courtroom 1B. | UNASSIGNED |

EXHIBIT C

| 09/30/2015 | Case called for pretrial. State present by ASA Wiseman. Defendant present with PD Salazar. Defendant moves to continue. State has no objection. Motion allowed. Case is reset, defendant given in court notice. Copy on file. (ddb) | KEW |
|---|---|---|
| 08/04/2015 | Agreed Order to Vacate Order for Arrest Warrant to Issue filed.(bp) Pre-trial set for 09/30/2015 at 8:30 in courtroom 1B. | UNASSIGNED |
| 07/23/2015 | Case called for pretrial. State present by ASA Beth Pfohl. Defendant fails to appear. PD Brakke present. Court orders warrant to issue in the amount of $3,000 (10%). | KEW |
| 06/01/2015 | OR Bond on file. (tb) Pre-trial set for 7/23/15 at 8:30 in courtroom 1B. | UNASSIGNED |
| 05/29/2015 | ARR: Deft. present in custody via video, sworn and advised of charges, rights, and penalties. Copy of information tendered in open court. State present by ASA Pfohl. PD appointed with possible reimbursement. Financial affidavit on file. Order of Appointment of PD on file. Deft. enters a plea of not guilty and case is set for Pre-Trial. Deft is to sign an anticapatory waiver before she bonds. Deft given in court notice, copy on file. Deft. remanded to the custody of the sheriff in lieu of $2,000(10%). Deft. ordered to have no contact with victim or no entry to victims residence. Deft. advised of in absentia rights. Deft. ordered to report to the PD office immediately upon release. Pre-trial set for 7/23/15 at 8:30 in courtroom 1B. Agreed ORDER to modify conditions of bond from being released on $2,000 10% to releasing deft on $2,000 OR on file. Anticipatory extradition waiver filed. | UNASSIGNED |
| 05/29/2015 | Complaint filed on 05/29/2015. F/W DOB: 9/29/1987 CT I - THEFT UNDER $500 (CLASS A) D/O ON OR ABOUT THE 28th DAY OF MAY, 2015 IN CUSTODY Arraignment set for 05/29/2015 at 1:00 in courtroom 107. | UNASSIGNED |

For questions or comments about this web site, please see our Contacts Page.

Terms of use | Privacy policy

Advertise on Judici.

Copyright © 2002-2017 Judici.

Last modified: 2017/04/28 12:05 Version: 3.9.0.128